IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GREGORY WALLOP, #347-896,
                Plaintiff,           :

                v.            :  CIVIL ACTION No. PWG-13-2355

CARLA BUCK, R.N.,           :
DAWN HAWK, R.N.,
MONICA METHENY-WILT, R.N.,   :
COLIN OTTEY, M.D.,
OLIVIA RYAN, RHIT,        :
WARDEN BOBBY P. SHEARIN, &
WEXFORD HEALTH SOURCES, INC.,  :
                Defendants.

**<u>MEMORANDUM OPINION</u>**

Gregory Wallop ("Wallop") is suing Bobby Shearin, former Warden of North Branch Correctional Institution ("NBCI"), Registered Nurses Carla Buck, Dawn Hawk and Monica Metheny-Wilt, Doctor Colin Ottey, Medical Records Director Olivia Ryan, and Wexford Health Sources, Inc. ("Wexford") pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 1). Defendants have filed motions to dismiss or, in the alternative for summary judgment with verified exhibits,[1]

---

[1] Defendant Wexford, a contractual prison health care company, filed a motion to dismiss or, in the alternative, for summary judgment, ECF No. 25, along with a supporting memorandum, ECF No. 25-1, and two supplements, ECF Nos. 33, & 41, on behalf of the individual medical providers for the period during which they worked for Wexford. Another contractual prison health care company, Corizon, Inc., filed a motion to dismiss or, in the alternative, for summary judgment, ECF No. 35, on behalf of the individual medical providers for the period during which they worked for Corizon, Inc. Shearin filed ECF No. 28. Defendants' motions, which I will treat as motions for summary judgment, are accompanied by exhibits that include affidavits and hundreds of pages of Plaintiff's medical records. For ease of reference, I will refer to these documents by their electronic filings numbers and cite to the pagination in the electronic docket.

Wexford, on its own behalf and on behalf of its employees, also moves to seal its dispositive motion on the basis that relevant medical records attached as exhibits thereto contain Wallop's personal information and that redaction would "eviscerate" its dispositive motion. (ECF No. 42). Plaintiff, however, has not requested sealing of the information. To the extent that the motion and exhibits contain personal information, Wexford is directed to file redacted versions of those

which are unopposed.[2]   No hearing is needed to resolve the issues. *See* Local Rule 106.5 (D. Md. 2014).

Plaintiff claims he was deprived of his Eighth Amendment right to medical treatment following an injury to his jaw received on March 23, 2012, when he was "elbowed" during a basketball game in prison.   He seeks a declaratory judgment as well as money damages and injunctive relief mandating his transfer from NBCI[3] and additional medical care, including surgery and a dental "night guard."[4]  (Compl. 14, 24-25).

At the time Wallop was injured, defendants Nurses Buck, Hawk, Metheny-Wilt, Dr. Ottey and Director Ryan (the "Medical Defendants") were employed by Corizon, Inc. ("Corizon"), a health care corporation under contract to provide medical personnel to Maryland's prisons. Wexford was then under contract with the Department of Corrections, but held a more limited role in providing utilization review services for the state's prisoners.   Effective July 1, 2012,

---

documents, along with a renewed motion seeking to seal the unredacted versions.  The motion to seal currently before the court shall be denied.

[2]  The record shows that Wallop was served with notice of Defendants' filings pursuant to the requirements of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). (ECF Nos. 27, 29 and 37). Wallop requested and received additional time to respond to the dispositive motions. (ECF Nos. 36 and 39).  He has chosen not to respond.

[3]  At the time of his injury, Wallop, a Maryland Division of Correction prisoner, was housed at NBCI.  On September 9, 2013, Wallop notified the Clerk that he had been transferred to Western Correctional Institution, which like NBCI also is located in Cumberland, Maryland.  As a result, his request for transfer to another facility has been rendered moot.

[4]  A night guard is "[a] removable appliance worn at night to help an individual minimize the damage or wear while clenching or grinding teeth during sleep."   *See* http://www.mylifemysmile.org/glossary. Wallop received a night guard on January 14, 2014. Therefore, this request also is moot.

Wexford became both the utilization review provider and the entity through which Maryland's prison health care personnel, including the Medical Defendants, were employed.[5]

## I.   PLAINTIFF'S ALLEGATIONS

Immediately after he was elbowed in the jaw, Wallop informed the correctional officer on duty that he had been injured and needed medical attention.  The officer contacted the medical department, but was told by a member of the medical staff to call back.  Wallop asserts that when the officer called back, he was told to have Wallop put in a sick call slip.  The officer brought Wallop the slip, which was filled out and placed in the designated box.  Wallop attached the sick call slip, which is dated "March 23rd" but stamped "RECEIVED APR 02 2012."  (Compl. Ex. B, ECF No. 1-1).

Wallop asserts that over the following three days he submitted additional sick call slips daily, each time complaining of jaw pain and swelling, and spoke with members of the nursing staff, informing them of his discomfort and requesting pain medication.  He claims that on each occasion, he was told that they could not give him any pain medication.  (Compl. 3-4).  Wallop attached the March 26, 2012 sick call slip, which was received that same day.  (Compl. Ex. C, ECF No. 1-1).

Wallop states that, on March 26, 2012, Sergeant Youngblood noticed his swollen jaw.  After he told her what happened, Sgt. Youngblood contacted medical personnel who indicated Wallop would be evaluated.  The evaluation did not occur until March 28, 2012, when a nurse examined Wallop, provided no pain medication, and recommended he be treated by a doctor. (*Id.*

---

[5] The interplay between the two corporations regarding their contracts with the State of Maryland is known to the Court.  *See, e.g., Ross v. Wexford Health Sources, Inc., et al.,* Civil Action No. RWT-12-3345 (D. Md.), ECF No. 18, Ex. 1 and ECF No. 27, nn. 5 & 6.  As previously noted, although it is not itself a party to this action, Corizon, through counsel, has responded to the complaint on behalf of its then-employees for the period preceding July 1, 2012. *See* ECF No. 35.

at 5-6).  Wallop asserts that he was finally seen by Dr. Alan Graves, DDS, on March 30, 2012.

Wallop's medical records show that on that date, Dr. Graves examined Wallop, took Panorex X-

rays, and determined that he had a fractured jaw.  (Compl. Ex. N, ECF No. 1-1).  Dr. Graves

placed Wallop on a puree diet and prescribed Tylenol #3 for the pain. (Compl. 5-6).

Wallop indicates that he received no care over the course of the next several days, due to a

dispute between the medical and dental departments as to who was responsible for his care.  (*Id*.

at 7-8).  Wallop was in pain and having difficulty eating.  On April 13, 2012, he again saw Dr.

Graves, who extended the prescription for pain medication.  (*Id*.).

On April 24, 2012, Wallop received oral surgery at the University of Maryland.  He was

then transported to another facility and later taken to Jessup Correctional Institution ("JCI").  His

complaints of pain were ignored for several hours before he was provided medication.  Wallop

asserts that the nurses failed to follow prescription instructions to provide medication every six

hours, because in prison, medication is distributed only twice a day.  (*Id*. at 10).  On May 25,

2012, Wallop was taken to the infirmary at Western Correctional Institution and on May 4, 2012,

was discharged and transported back to NBCI.  (ECF No. 28-4, p. 1).  Shortly thereafter, Dr.

Ottey allegedly amended plaintiff's prescription for pain medication so that it would be

administered only twice a day, and prescribed an oral rinse, in contravention of the oral surgeon's

directives. (Compl. 11).

Wallop asserts that he was informed that his bite pattern would never be the same, his

fracture was healing incorrectly, and he was beginning to develop an infection and gingivitis. (*Id*.

at 12).  Over the course of the next several days, the medical staff allegedly failed to provide him

with his prescribed medical treatment, which consisted of pain medication, mouth rinse, and

Ensure, a dietary supplement. (*Id*. at 13-14).  Wallop stated that one of the officers told him the

decisions were made by the medical department and that there was nothing the officer could do. (*Id*. at 14).  Wallop asserts that the actions or inaction of the medical staff has resulted in his jaw healing incorrectly, his having to wear a night guard to ease his pain, continued issues with tongue biting, and his need for additional surgical procedures. (*Id*.).

## II.     DEFENDANTS' RESPONSES

### A.     Warden Shearin

Correctional defendant Bobby Shearin, Warden at NBCI at the time of the incident alleged, asserts that he played no role in providing medical treatment to prisoners, and requests dismissal of the claims against him or entry of summary judgment in his favor.

In support of his dispositive motion, Shearin has submitted his declaration in which he attests that he defers to the expertise of the medical authorities with regard to complaints involving prisoner medical care.  (Shearin Decl., Shearin Mem. Ex. 3, ECF No. 28-11).  Shearin also argues that Wallop did not fully exhaust his administrative remedies by filing Administrative Remedy Procedure ("ARP") complaints concerning medical care as required under the Prison Litigation Reform Act ("PLRA"); that he cannot be held liable as a supervisor for alleged wrongdoing on the part of medical personnel; and that he is entitled to qualified immunity from suit.

### B.  Medical Defendants

#### 1.  *Medical care prior to July 1, 2012*

The Medical Defendants' responses include hundreds of pages of Wallop's medical records, much of which is irrelevant, as well as two affidavits submitted by Dr. Ottey.  The relevant medical history is summarized as follows.

Wallop, in his early thirties, suffered a sports-related jaw injury that resulted in chronic

myofascial pain[6] and class I malocclusion.[7]   (ECF No. 25-6, p. 2).   On March 28, 2012, he was

seen by Nurse Metheny-Wilt in response to a sick call slip submitted complaining of jaw pain

resulting from a basketball injury.   (ECF No. 35-2, p. 7).   Wallop was referred to the on-site

dentist, Alan Graves, DDS.   (ECF No. 25-5, pp. 303-04).   On March 30, 2012, Dr. Graves

prepared a consult request for Wallop's evaluation by an oral surgeon for evaluation and

treatment of a fractured jaw.   (*Id.,* pp 247-48).   This request was presented to Wexford for

utilization review and approved on April 3, 2012.   (ECF No. 35-2, p. 26; ECF No. 35-3, p. 2).

"[O]n April 24, 2012, Plaintiff was seen and evaluated by oral maxillo facial surgeon,

James Murphy, M.D., at University of Maryland Medical System ('UMMS')."   (ECF No. 25-6,

p.4; ECF No. 25-5, pp. 249-50).   "At that time, Plaintiff reported altered sensation, altered bite

and pain on chewing."   (*Id.*).   Examination revealed "no facial swelling, no step deficit [gap] of

the mandible on palpation and good . . . bite." (*Id.*).   Dr. Murphy noted "a right parasymphyseal

fracture of the right jaw."[8] (*Id.*).   To treat the injury, Wallop "was given the options of a soft diet,

open reduction internal fixation of the fracture ('ORIF'), or maxilla-mandibular fixation ('MMF')

---

[6] This pain disorder results from pressure that affects sensitive points in the muscle and "caus[es] pain in seemingly unrelated parts of the body."   *See* http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/definition/con-20033195.   It is sometimes called "referred pain."   *See id.*

[7] "An occlusion refers to the alignment of teeth and the way the upper and lower teeth fit together on biting. A malocclusion is a misalignment of the upper and lower jaw resulting in an abnormal bite pattern," and is "common following a jaw fracture."   (ECF No. 25-6, p. 6). "Symptoms of malocclusion include abnormal appearance of the face, abnormal alignment of the teeth, difficulty or discomfort when chewing, speech difficulties and mouth breathing." (*Id.*).   "There are three different classes of malocclusion," with Class 1, the most common, "occur[ring] when the bite is normal, but the upper teeth slightly overlap the bottom teeth." (*Id.*).

[8] Parasymphyseal fractures are those "occurring in the area of the mandible from cuspid to cuspid, but not in the midline."   *See* Mandibular Symphyseal and Parasymphyseal Fractures: Problem, http://emedicine.medscape.com/article/869242-overview#a0103.

with internal maxillary fixation ('IMF') with screws."[9] (ECF No. 25-6, p. 4). Wallop "elected IMF screws with MMF." (*Id.*). "Dr. Murphy placed the screws and elastic bands to fuse the fracture and ordered Plaintiff placed on a full liquid diet" with Tylenol for pain, and advised him to rinse with Peridex[10] mouthwash, and to follow up in two weeks. (*Id.*).

On April 24, 2012, a request was presented to Wexford for utilization review of Wallop's reevaluation by the oral surgeon, and approved the same day. On May 8, 2012, Wallop was reevaluated at UMMS by the oral surgeon, who noted Wallop had done well with the surgery and had been compliant with his soft diet and mouthwash regimen. The oral surgeon recommended that Wallop continue use of his elastic bands, mouthwash, and soft diet for two more weeks and two weeks after that, return for a follow up prior to discontinuing use of the rubber bands. (ECF No. 25-5, pp. 252-56).

On or about May 18, 2012, a request was presented to Wexford for utilization review of reevaluation by the oral surgeon and to assess Wallop for poor healing and inflammation in the area of the screws. This request was subsequently approved and on May 29, 2012, Wallop was seen and evaluated by oral surgeon Matthew Lee, M.D. (ECF No. 25-4, p. 3; ECF No. 25-5, p. 261). Dr. Lee observed soft tissue swelling at the mandibular site, but noted that the fracture was healing well. (ECF No. 25-5, p. 261). Dr. Lee removed the mobile MMF screws, treated the soft tissue swelling at the IMF screws, replaced Wallop's elastic bands, ordered he receive a liquid

---

[9] Simple fractures are usually treated with "closed reduction and indirect skeletal fixation," more commonly referred to as MMF. (ECF No. 25-6, p. 4). This treatment includes "hold[ing] the fractured bone in place with screws and heavy elastic bands to promote fusion and healing of the fracture." (*Id.*).

[10] Peridex (Chlorhexidine gluconate) "is a germicidal mouthwash that reduces bacteria in the mouth." *See* http://www.drugs.com/mtm/peridex-oral-rinse.html.

diet and Peridex rinse after all meals, and be provided pain management, and return for follow-up in one week. (*ld*.).

On or about June 13, 2012, a request was presented to Wexford for utilization review for reevaluation by the oral surgeon for follow-up and to assess Wallop's complaints of pain, swelling and pus draining from the mouth.  (ECF No. 25-4, pp. 4-5; ECF No. 25-5, p. 262).  It was noted that Wallop had not complied with antibiotic treatment. (*Id.*).  The reevaluation request was approved by Wexford and on June 26, 2012, Wallop was again evaluated at UMMS by Dr. Lee.  (ECF No. 25-4, p. 5; ECF No. 25-5, p. 264).  At that time, Wallop complained of jaw pain in the area of the IMF screws and lower right pre-molar.  On exam, no facial swelling or gross mobility of the mandibular area was noted; however, Dr .Lee noted that the soft tissue at the sites of the IMF screws were painful and completely covered.  Dr. Lee assessed Wallop's fracture as healing well, but with redundant tissue[11] at the screw sites.  Dr. Lee removed the screws and noted that removal of the lower right screw required an incision to uncover redundant tissue in that area.  Dr. Lee recommended Wallop begin a soft mechanical diet and return for follow-up in one month. (ECF No. 25-5, p. 264).

### 2.   Medical care on or after July 1, 2012

On July 1, 2012, Wallop submitted a sick call slip complaining of numbness at the right side of the jaw and cheek. (ECF No. 25-5, p. 205).  On July 2, 2012, he was evaluated by dentist Scott Nichols, DDS.  At that time, Dr. Nichols observed a draining fistula[12] in the area where the

---

[11] Redundant tissue (epulis fissuratum) is "a curtainlike fold of excess tissue associated with the flange of a denture."  *See* http://medical-dictionary.thefreedictionary.com/epulis. It also is called inflammatory fibrous hyperplasia. *See id.*

[12] "A fistula is a permanent abnormal passageway between two organs in the body or between an organ in the body and the exterior of the body."  *See* http://medical-dictionary. thefreedictionary.com/Fistula.

site screw was removed.  Dr. Nichols completed a Panorex x-ray, ruled out an infection in the tooth, and opined that Wallop had developed a draining fistula in the area where the screws were removed. (*ld*. at 307).

On July 5, 2012, Wallop was seen by Nurse Buck, who noted he had been complaining of right jaw and cheek pain for two months and had recently been evaluated for this complaint at UMMS.  Wallop was alert and oriented with good color.  He was advised that he would be referred to a provider for his complaints.  (ECF No. 25-5, pp. 81-82).  Until then, he was instructed to return to the medical department if he developed signs and symptoms of infection. Later that same day, Wallop was reevaluated by Nurse Buck after being involved in an altercation with another inmate. (*Id.* at 83).  During this encounter, Wallop reported being struck in the right side of the face.  No swelling, abrasion or bruising was noted, and Wallop was able to talk without difficulty.  Nurse Buck's findings were reported to Dr. Ottey, who instructed that Wallop could be released from the medical department and returned to his cell. (*ld*.).

On July 15, 2012, Wallop told Nurse Cortez that he recently had been in an altercation and may have reinjured his right jaw.  Wallop also requested evaluation by a provider and renewal of his liquid diet due to trouble chewing thick food.  Wallop reported a pain level of 7/10.  Nurse Cortez referred him to the on-site dentist and to a provider for reevaluation of his complaints. (ECF No. 25-5, pp. 86-87).

On July 31, 2012, Wallop was seen by Dr. Ottey for his mandibular fracture. (*Id*. at 90-91).  He complained of pain, particularly with range of motion, but denied numbness or tingling. Wallop indicated he remained on a liquid diet.   Dr. Ottey noted tenderness at the

temporomandibular joint[13] ("TMJ") and limited range of motion, but no swelling.  Wallop's medication regimen was continued, including Tylenol #3[14] and Peridex mouth wash.  Wallop was told that he would be reevaluated in two weeks.  (*Id.*).

On August 8, 2012, Wallop was reevaluated by Dr. Ottey and reported increased pain with chewing and tongue biting.  Dr. Ottey and the dentist agreed that Wallop would be referred to UMMS for reevaluation by the oral surgeon. (ECF No. 25-5, pp. 96-97).

On August 10, 2012, Dr. Graves informed Wallop that he would be referred back to UMMS.  (*ld.* at 317).   Subsequently, Wexford's utilization review approved the referral and Wallop was evaluated by Biraj Shah, DDS at UMMS on August 28, 2012.  (*Id.* at 267).   Wallop told Dr. Shah he was biting his tongue due to an off-bite.  (*Id.*).  Dr. Shah noted no facial swelling or hemorrhage, but felt a small "step" at the right lower jaw at the line of the fracture.  The floor of the mouth was soft with no elevation, but an assessment of the oropharynx revealed a slight open bite on the right.  Dr. Shah assessed a healing fracture of the jaw with open bite and recommended Wallop be seen by a dentist for an occlusal adjustment[15] to repair the maloclussion, and thereafter return to the oral surgeon in six months for reevaluation. (*Id.*).

---

[13] The temporomandibular (TMJ) joint acts like a sliding hinge, connecting the jawbone to the skull. Disorders can cause pain in the jaw joint and in the muscles that control jaw movement. *See* http://www.lifescript.com/health/a-z/conditions_a-z/conditionsindepth/t/temporomandibular_joint _tmj_syndrome.aspx.

[14] Tylenol #3 combines Tylenol 325 mg with 30 mg of codeine. Tylenol (acetaminophen) "is a pain reliever and a fever reducer . . . used to treat many conditions such as headache, muscle aches, [and] arthritis." *See* http://www.drugs.com/acetaminophen.html. Codeine is an opioid or narcotic pain medication "used to treat mild to moderately severe pain." *See* http://www.drugs.com/codeine.html.

[15] Occlusal equilibration is "[t]he modification of the chewing and biting surfaces of teeth by grinding" to place the mandible in a state of equilibrium. *See* http://medical-dictionary.thefreedictionary.com /occlusal+equilibration.

On August 31, 2012, Wallop was seen by the on-site dentist, Dr. Graves, who noted the recommendation for an occlusal adjustment, which was outside his expertise.   Dr. Graves determined that Wallop would be referred to the medical department for further management. (*ld*. at 316).

On September 22, 2012, Wallop was seen by Nurse Hawk in response to a sick call slip complaining of jaw pain and requesting pain medication.  (*ld*. At 104).  He complained of jaw swelling in the mornings and shooting pains from lower jaw to his eye.  Wallop also requested renewal of his Tylenol #3.  He had no difficulty speaking or moving his jaw and no swelling noted to jaw or face.  Wallop was advised that he would be referred to a provider. (*Id.*).

On September 24, 2012, Wallop was seen and evaluated by Greg Flury, P.A., who determined that Wallop should continue on his pain medication regimen and be referred back to the on-site dentist for reassessment of the malocclusion.   Wallop was told he would be rescheduled to return to UMMS in three months. (*Id.* at106).

On September 27, 2012, Wallop was seen by the on-site dentist.  (ECF No. 25-5, p. 318). He reported slight jaw swelling, a bump at the area of tooth # 29, and pain of 3 on a scale of 1 to 5.   On exam, no swelling or lymphadenopathy was noted. (*Id.*).   X-rays showed exostosis[16] developing at the area of tooth #29.  Wallop was assessed with possible swelling and exostosis. The evaluating dentist noted that an occlusal adjustment was recommended by Dr. Shah and suggested that Wallop should be referred back to UMMS for reassessment of that recommendation.  On October 3, 2012, he was reevaluated by the dentist for medication renewal and provided regular Tylenol (acetaminophen 325 mg) for his complaints. (*Id.*).

---

[16] Exostosis is a cartilage-capped bony projection arising from any bone that develops from cartilage. *See* http://www.wisegeekhealth.com/what-is-an-exostosis.htm#didyouknowout.

On October 10, 2012, Wallop complained to Dr. Ottey of moderate-to-severe sharp right lower jaw pain radiating to the TMJ.  (ECF No. 25-5, pp. 109-10).  He stated his discomfort occurred after periods of rest, brushing his teeth and chewing.  Wallop also reported frequent tongue biting.  Examination revealed TMJ tenderness limited range of motion. Dr. Ottey renewed Wallop's Tylenol-Codeine #3 prescription and referred him to the on-site dentist for follow-up. (*Id.*).

On October 12, 15, and 19, 2012, Wallop refused to be seen by the on-site dentist. (ECF No. 25-5, p. 320).  On October 31, 2012, his Peridex mouthwash and Tylenol #3 prescriptions were renewed.  (*Id.* at 114-17).

On November 18, 2012, Wallop submitted a sick call slip seeking evaluation for complaints of a blister on the inside of his mouth.  (*Id.* at 221).  On November 24, 2012, he refused evaluation by Nurse Buck, but was seen by Dr. Ottey.  (*Id.* at 123)  Wallop raised no complaints of jaw pain and denied fever and chills. An assessment of his lips, teeth and gums revealed no swelling or drainage, but he did have gingivitis.  Wallop was prescribed penicillin and ordered to continue use of his other medications, including Peridex and Tylenol-Codeine #3, and to return to the medical clinic if his condition did not improve. (*ld.*).

On November 29, 2012, Wallop was seen by the on-site dentist.  (*Id.* at 320).  He denied swelling of his jaw and received a scheduled teeth cleaning.  (*ld.*).  On December 11, 2012, he received teeth scaling[17] to treat his gingivitis.  He did not complain about his jaw at that time. That same day, Wallop submitted a sick call slip complaining of having bitten his tongue resulting

---

[17] Scaling is "[t]he removal of dental plaque—an early lesion that predisposes to periodontitis and 'tartar or calculus from the crown of a tooth and/or exposed root surfaces." *See* http://medical-dictionary.thefreedictionary.com/scaling.

in intermittent bleeding.  (*Id.* at 223).  Nurse Cortez examined the tongue on December 14, 2012, and found a reddened area.  (*Id*. at 124-25).

On December 21, 2012, Wallop "was reevaluated by the on-site dentist in response to multiple complaints, including throbbing pain and swelling of the jaw, a tight opening mouth, a mouth blister which Plaintiff contended leaked pus and a bone and fat sticking out of his jaw." (ECF No. 25-6, p. 7; ECF No. 25-5, pp. 321-22).  "[T]he evaluating dentist noted a slightly enlarged alveolar bone at the #29 tooth."[18]  (ECF No. 25-6, p. 7).  He was told that medical staff would respond to his request regarding the status of his referral back to UMMS.  (ECF No. 25-5, p. 322).

On January 2, 2013, Wallop requested renewal of his Tylenol #3, scheduled to expire on January 5, 2013.  (*Id.* at 227).  On January 16, 2013, Dr. Ottey examined Wallop, who reported good pain relief with his medication.  A decreased range of motion and tenderness in the TMJ were noted.  The Tylenol #3 prescription was renewed. (*Id.*).

On February 3, 2013, Wallop submitted a sick call slip requesting renewal of his Tylenol #3 and complaining of a swollen jaw.  (*Id.* at 229).  On February 7, 2013, P.A. Flury informed him that he would be referred to the physician for medication renewal for jaw pain. (*Id.* at 132-33).  Wallop was also seen by the on-site dentist for his complaint that "the underside of his tongue had been swollen three days ago for 48 hours, but had resolved."  ECF No. 25-6, p. 8). "On assessment, 'no problem was found' and the dentist reviewed oral hygiene instructions with Plaintiff." (*Id.*; ECF No. 25-5, p. 323).

---

[18] Alveolar bone is "the thin layer of bone making up the bony processes of the maxilla and mandible, surrounding and containing the teeth; it is pierced by many small blood vessels, lymphatic vessels, and nerves." *See* http://medical-dictionary.thefreedictionary.com/alveolar +bone.

On February 12, 2013, Wallop submitted a sick call slip requesting renewal of his Tylenol #3 medication and Ensure supplement. (ECF No. 25-5, p. 230). On February 14, 2013, Wallop was seen by Joubert, who noted that he talked without difficulty and that the injury had been sustained in 2012. (*Id.* at 135-36). Joubert declined to renew the prescription for Tylenol #3 and Ensure supplements as "not indicated."

On February 17 and 19, 2013, Wallop submitted sick call slips complaining of pain in his jaw and requesting renewal of his Tylenol-Codeine #3 medication and Ensure supplement. (*Id.* at 231 and 233). On February 20, 2013, he informed Nurse Cortez that his pain was a 7 on a ten-point scale. Nurse Cortez instructed Wallop to use analgesics and apply hot and cool compresses at the affected area. (*Id.* at. 137-40). On March 3, 2013, Wallop was again seen by Nurse Cortez for continued complaints of jaw pain. No change was noted on assessment, and Plaintiff's treatment plan remained the same. (*Id.* at 143-45).

On March 1 and March 8, 2013, Wallop was seen and evaluated by the on-site dentist. (*Id.* at 323-24). On March 8, 2013, Dr. Graves diagnosed Wallop as "suffering from myofascial pain and malocclusion with problems eating." (ECF No. 25-6, p. 8; ECF No. 25-5, p. 324). Dr. Graves completed a consult request for Wallop to be referred back to UMMS because on-site dental staff had been unsuccessful in managing his chronic pain and malocclusion. (ECF No. 25-5, pp. 269-70). On March 18, 2013, participants in a Wexford utilization review panel "place[d] the consult request on hold for further clinical information and in the interim [decided] to continue conservative management."[19] (ECF No. 25-6, pp. 8-9). Wallop's prescription for Tylenol #3 was renewed. (ECF No. 25-4, p. 5, ECF No. 25-6, pp. 8-9).

---

[19] Wallop maintained a consistent weight between 154 and 159 pounds between the time of his injury and October of 2013. (ECF No. 25-5, pp. 6 and 193).

On April 15, 2013, "[Dr.] Graves resubmitted a consult request for Plaintiff's reevaluation by the oral surgeon for compromised masticatory ability."  (ECF No. 25-6, p. 9; ECF No. 25-5, p. 271).  On April 17, 2013, Wallop "was seen and evaluated by [Dr.] Ottey for follow-up regarding his jaw pain."  (ECF No. 25-6, p. 9).  He "reported tongue biting, locking of the jaw," and trouble chewing.  (ECF No. 25-6, p. 9; ECF No. 25-5, pp. 147-49).  The jaw was tender and showed decreased range of motion. (ECF No. 25-5, pp. 147-49).  On April 21, 2013, Wallop was seen by Nurse Cortez in response to complaints that he bit his tongue in his sleep.  A portion of the tongue was red.  (*Id.* at 151-52).

On May 1, 2013, Wallop's case was represented to utilization review for recommendation for his reassessment by the UMMS oral surgeons and approved the same day.  (ECF No. 25-4, p. 5).  Pending a referral back to UMMS on May 2, 2013, Wallop was reevaluated by Nurse Cortez for complaints of stiffness in this jaw, difficulty with chewing and unintentional biting of plaintiff's tongue.  (ECF No. 2-5, pp. 153-55).  On physical exam, no jaw tenderness or swelling was noted and range of motion was within normal limitations.  Wallop was instructed to continue his current medication regimen and to apply hot and cold compresses to the jaw. (*Id.*).

On May 6, 2013, Wallop was seen by P.A. Flury who noted the pending request for reevaluation by UMMS oral surgeons.  (*Id.* at 156-57). On physical exam, no abnormalities of the throat were documented and Wallop was advised that the status of his consult request would be checked.  On May 8 and 15, 2013, Wallop submitted sick call slips reiterating complaints of jaw pain, problems chewing and inadvertent tongue biting. (*Id.* at 237, 238). Plaintiff also requested renewal of his Tylenol #3 prescription.

On May 21, 2013, Wallop "was seen at UMMS for reevaluation of his complaints," including "jaw stiffness and inadvertent biting [of] his tongue."  (ECF No. 25-6, p. 9).    Wallop

denied facial swelling.  (ECF No. 25-5, pp. 273-74). The fracture was well healed; however, it "was noted that Plaintiff [might] benefit from an occlusal adjustment if possible and an occlusal night guard to prevent biting his tongue at night."  (ECF No. 25-6, p. 9).  "Additionally, an extraction of tooth #29 was proposed as part of the occlusal equilibration plan." (*Id.*)  "A follow-up with the dentist was recommended to discuss the risk and benefits of the proposed extraction," and "[i]t was recommended that Plaintiff return to UMMS for further management as needed." (*Id.*).

On May 28, 2013, Wallop was reevaluated by Nurse Cortez for complaints of jaw stiffness, trouble chewing, and unintentional tongue biting.  (*Id.* at 160-62).  On physical exam, no jaw tenderness or swelling was noted and range of motion was within normal limits.  Wallop was instructed to continue his current medication regimen and to apply hot and cold compresses. (*Id.*).

On June 7, 2013, Wallop was evaluated by P.A. Flury for jaw pain and indicated acetaminophen (Tylenol) did not provide pain relief.  (*Id*. at 163-64).  The UMMS physician's notes were illegible, and P.A. Flury indicated a typed consult would be requested.  P.A. Flury issued Wallop a prescription for Tegretol[20] for his continued complaints of jaw pain to take in conjunction with acetaminophen.

On June 21 and June 24, 2013, Wallop was seen for his complaints of jaw pain by Dr. Graves.  Dr. Graves noted that a night guard, along with a possible occlusal equilibration with extraction of tooth# 29, had been recommended.  Dr. Graves noted that an occlusal night guard

---

[20] Tegretol (carbamazepine) "is an anticonvulsant [that] decreas[es] nerve impulses that cause seizures and pain," such as pain in the trigeminal area of the face.  *See* http://www.rxlist.com/ tegretol-drug/patient-images-side-effects.htm.

would help decrease bruxism[21] resulting in reduction of myofascial pain.   Dr. Graves further noted that the occlusal adjustment with a possible extraction would be outside his scope of treatment and thus this issue would be referred to medical for submission of a request for collegial review.  (*Id.* at 327).

On June 29, 2013, Wallop reported that he had stopped taking Tegretol because it made him ill.  Tylenol was provided.  (*Id.* at 166).  On July 2, 2013, he was approved for an on-site evaluation by the orthodontic specialist for a fitting of a night mouth guard.  (ECF No. 25-4, p. 5).

On July 26, 2013, Wallop was seen by Nurse Swan for complaints of jaw pain.  Swan noted that he was scheduled to be reevaluated by a provider in the next 15 days and that his treatment plan included sending him out for a mouth guard fitting.  (*Id.* at 173-75).

On July 28, 2013, plaintiff submitted a sick call slip complaining of excruciating and throbbing jaw pain and requesting medication.  (*ld*. at 244).  In response, Nurse Hawk noted that Wallop was scheduled to receive a mouth guard to improve complaints of pain and that he recently stopped taking Tegretol.  On July 29, 2013, Nurse Hawk again evaluated Wallop and noted that his facial movements were even and his range of motion of his jaw within normal limits.  (*Id.* at 176).  Wallop was advised that he would be referred to a provider for his pain medication needs. (*ld*.).

On August 3, 2013, Wallop was seen by Katie Winner, P.A. in response to his complaints of jaw pain. (*ld*. at 178-79).  At that time, plaintiff was requesting Tylenol #3.  P.A. Winner noted that Wallop was scheduled to be seen for a mouth guard and that he was receiving acetaminophen for pain.  On physical examination, no abnormalities of the nose, mouth or throat were noted.  A prescription for acetaminophen 500 mg. was written.  (*ld*.).

---

[21] Bruxism is the habit of grinding the teeth. It most often occurs at night during sleep, but may also occur during the day. *See* http://www.mylifemysmile.org/glossary.

On August 16, 2013, Wallop was seen by Dr. Ottey for follow-up regarding medication needs.  (*Id.* at 180-81).  Wallop reported inadequate relief with acetaminophen, a popping sensation when eating, and continued occasional inadvertent tongue biting.  His TMJ area was sore.  Dr. Ottey reissued a prescription for Tylenol #3 to take in conjunction with his acetaminophen prescription, and noted that the fitting for a night mouth guard remained pending.  (*Id.*).

On October 7, 2013, Wallop was seen by Dr. Graves for general dental care and prosthodontic repair.  At that time, Plaintiff raised no complaints related to his jaw injury including tongue biting or problems with chewing.  (*ld.* at 130).

On October 12, 2013, Wallop was seen by Cheryl Gunter, RN for complaints of jaw pain.  In response to a telephone order from Jason Clem, M.D., Gunter issued Plaintiff a 14-day prescription for Motrin 600 mg.  (*Id.* at 192).

On October 17, 2013, Wallop was seen by Dr. Graves for a general gross dental debridement.  He raised no complaints related to jaw pain or discomfort.  (*Id.* at 331).  Dr. Graves noted Wallop's malocclusion as a Class 1.  (*ld.*).

On October 21, 2013, Wallop was seen by Joubert in response to his request for Tylenol #3.  On exam, he was in no apparent distress.  Joubert elected to prescribe acetaminophen and Tylenol to use in conjunction with one another for a "synergistic effect."  Wallop was instructed to return to the medical unit for follow-up in two weeks. (*Id.* at 193-94).

On November 8 and 13, 2013, Wallop was seen by Dr. Graves for dental care related to prosthodontic repair of his lower partial denture.  (*Id.* at 332-33).  At that time, he raised no complaints related to his jaw.  On November 13, 2013, Wallop was seen by Dennis Martin, R.N.

in response to a sick call slip requesting Tylenol-Codeine #3.  At that time, he was advised to continue with his medication regimen prescribed by Joubert.  (*Id.* at 195).

The UMMS visit occurred on May 21, 2013.  A night guard was prescribed and it was suggested that a tooth might need to be removed in order to help realign the jaw.  A July 2, 2013 consult request to refer Wallop to an orthodontist to fit a night guard was approved the same day.  (ECF No. 25-4, p. 5).  A night guard was ordered, and pain medications were continued.  The night guard was delivered on January 14, 2014.  (ECF No. 41-1, p. 3).

## III.   STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1) (A);  *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986) (citing cases). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id*. at 252.

Wallop is proceeding pro se and his complaint is to be construed liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).  However, liberal construction does not absolve Wallop from pleading a plausible claim.  *See Holsey v. Collins*, 90 F.R.D. 122, 128 (D. Md. 1981) (citing *Inmates v. Owens*, 561 F.2d 560, 562–63 (4th Cir. 1977)).

## IV.   DISCUSSION

Wallop claims the Warden and the Medical Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  As interpreted by the Supreme Court, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003).  In the context of denial of medical care, an Eighth Amendment violation arises when the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the members of the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.,* 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."  *Johnson v. Quinones,* 145 F. 3d

164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge requirement is not met. *Id*. at 169 (reasoning that actions inconsistent with an effort to hide a serious medical condition refute the presence of subjective knowledge).  Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference.  *See Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975) (concluding that, where a prisoner was under constant medical supervision, his claims did not rise to the level of deliberate indifference).

## A.  Warden Shearin

In order to survive summary judgment for a claim under 42 U.S.C. § 1983, a plaintiff must "'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights.'"  *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)).  The doctrine of respondeat superior is generally inapplicable to § 1983 actions. *See Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Vinnedge v. Gibbs*, 550 F.2d at 927–99; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, Wallop must demonstrate that a defendant had "personal knowledge of and involvement" in the alleged constitutional deprivation to establish liability under § 1983. *Id.*  Wallop, however, does not allege any personal involvement by Shearin in the incidents presented in his complaint.

Liability of supervisory officials can be established, not based on ordinary principles of respondeat superior, but rather because of "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Section 1983 liability on the

part of a supervisor requires a showing that:1) the supervisory defendant failed promptly to provide an inmate with needed medical care,  2) the supervisory defendant deliberately interfered with the medical provider's performance, or 3) the supervisory defendant tacitly authorized or was indifferent to the medical provider's constitutional violations. *See Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).  Wallop seeks to hold Shearin responsible for his alleged lack of medical care solely because Shearin was Warden of the institution and reviewed his ARP complaining about medical care. This is the very essence of the doctrine of respondeat superior, which has no place in 1983 litigation. Shearin's general administrative responsibilities are insufficient to confer supervisory culpability.

As a nonmedical correctional supervisor, Shearin was entitled to rely on the medical judgment and expertise of prison physicians and medical staff concerning the course of treatment necessary for inmates.  *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th  Cir. 1990) (stating supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with an inmate's medical treatment ordered by such personnel).

Contrary to Wallop's contentions, Shearin's May 16, 2012 ARP response does not show interference with medical care. Rather, it demonstrates that Shearin, a nonmedical supervisor, appropriately relayed the concerns in the ARP for investigation.[22]  Shearin's subsequent answer was predicated on that investigation and was a reasonable response.  Wallop provides no evidence

---

[22] Wallop's subsequent ARP complaints raising ongoing concerns with medical treatment for the broken jaw were dismissed by prison ARP coordinators for procedural reasons.  (ECF No. 28-5, p. 1, ECF No. 28-7, p. 1, ECF No. 28-8, p. 1, ECF No. 28-9, p. 1).  Wallop withdrew one ARP request after he was informed that the complaint could not be further addressed through the ARP process.  (ECF No. 28-6, pp. 1-2).

that Shearin hindered his medical care or otherwise acted with deliberate indifference to his medical needs. For these reasons, Shearin is entitled to summary judgment in his favor as a matter of law.[23]

## B. Wexford

As a threshold consideration, Wallop's civil rights claim against Wexford, premised on a theory of respondeat superior, cannot proceed.  The law in the Fourth Circuit is well established that the doctrine is inapplicable to § 1983 claims involving entities such as Wexford.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Nedd v. Corr. Med. Servs.*, Civil Action No. JFM-92-1524 (D. Md. Oct. 22, 1992) (citing *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982)); *McIlwain v. Prince William Hosp.*, 774 F. Supp. 986, 990 (E.D. Va. 1991).

## C. The Individual Medical Defendants

 Defendants do not dispute that Wallop's jaw injury constituted a serious medical need, nor do they deny that the injury resulted in chronic myofascial pain and a malocclusion.  The sole dispute before the Court is whether the length of time required to repair the broken jaw, restore Wallop's misaligned "bite," and address the residual pain caused by damage to that area of the face amounted to a violation of the Eighth Amendment by inflicting unnecessary and wanton pain.

A review of the facts before the Court shows that the frequency and the scope of the medical care provided to Wallop, while perhaps less than ideal, were far from amounting to deliberate indifference.  The injury occurred on March 23, 2012.  Plaintiff submitted a sick call

---

[23] Because Shearin cannot be held liable, his argument concerning qualified immunity and his affirmative defense concerning failure to exhaust under the PLRA are not addressed here.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007) ("[F]ailure to exhaust is an affirmative defense under the PLRA.").

slip dated March 23, 2012, but that slip was not received until April 2, 2012.  He submitted another sick call slip on March 26, 2012.  That sick call slip triggered a nurse visit on March 28, 2012 and Wallop saw a prison dentist who diagnosed the extent of the injury on March 30, 2012.  An immediate consultation request for evaluation by an oral surgeon was provided to Wexford and approved on April 3, 2012.  Three weeks later, Wallop's jaw was surgically repaired by an oral surgeon at UMMS.  Two weeks thereafter, on May 8, 2012, Wallop returned to the oral surgeon for reassessment.  The oral surgeon continued to evaluate Wallop's progress on two occasions during May and June of 2012.  Pain medications were made available throughout this period.

Wallop experienced a setback in July, due to a tooth infection, a possible fistula at the surgical site, and a blow to the face sustained during an altercation with a fellow prisoner.  When pain and tongue biting developed, both a prison doctor and a prison dentist sought to refer him back to UMMS for reevaluation by the oral surgeon.  Wexford approved the consultation, and Wallop returned to UMMS on August 28, 2012, where it was determined that he needed to see a dentist to adjust a malocclusion.   The prison dentist, however, felt that such adjustment was outside the scope of his expertise, and referred Wallop back to the prison medical department for further management.  Pain medications continued to be provided, dental scaling occurred, and Wallop continued to see both prison dental and medical personnel while awaiting another UMMS visit.

The UMMS visit occurred on May 21, 2013.  A night guard was prescribed and it was suggested that a tooth might need to be removed in order to help realign the jaw.  A July 2, 2013 consult request to refer Wallop to an orthodontist to fit a night guard was approved the same day.  A night guard was ordered, and pain medications were continued.  The night guard was delivered

on January 14, 2014.

These facts show that, although there were at times delays in the treatment of Wallop's jaw injury, the individual medical defendants did not act towards him with deliberate indifference.

## V.    CONCLUSION

There is no disputed material fact on which Wallop could persuade a jury to find that defendants' conduct demonstrated deliberate indifference to his serious medical needs.  For the reasons set forth above, Defendants' motions for summary judgment will be granted.  A separate order follows.

September 22, 2014   
Date

                    /S/                    
Paul W. Grimm
United States District Judge